# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 7, 2026

Lyle W. Cayce
Clerk

No. 25-50675

Tami Barrier,

*Plaintiff—Appellant*,

*versus*

United States of America,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 2:23-CV-58

Before Southwick, Graves, and Wilson, *Circuit Judges*.
James E. Graves, Jr., *Circuit Judge*:

In December 2021, United States Customs and Border Protection (CBP) Agent Robert Duran hit Tami Barrier with his vehicle while exiting a CBP station. Unaware of the impact, Duran drove to the union hall to receive supplies donated to the National Border Patrol Council (NBPC), which is the Border Patrol union, for distribution across the Del Rio, Texas CBP stations. Barrier sued the United States under the Federal Tort Claims Act (FTCA), alleging it was vicariously liable for Duran's conduct. The district court concluded that Duran was not acting within the course and scope of his employment when he hit Barrier and granted the Government summary

judgment. Because we conclude that a reasonable jury could disagree, we REVERSE and REMAND.

## I. BACKGROUND

### A. Agent Duran's Union Duties

At the time of the incident, Duran held a full-time union leadership position as Executive Vice President and Lead Steward of the Del Rio sector of the NBPC. Under the Federal Service Labor-Management Relations Statute, a federal employee can be "granted official time in any amount the agency and the exclusive representative involved agree to be reasonable, necessary, and in the public interest" to perform union duties. 5 U.S.C. § 7131(d). As Duran testified, CBP has six full-time elected union officer positions, and those officers spend most of their time on union duties and control their own work. CBP pays the union officers for eight hours of union work and two overtime hours reserved for "work of the agency."

Duran enjoyed discretion over his daily union duties, which "encompass[ed] a whole lot of things." This included overseeing day-to-day union operations within his station and serving as a main point of contact with management. He also helped delegate work to other union stewards and was "charged with making sure that the vice presidents were overseeing the corridors." CBP Agent Jonathan Anfinsen, the NBPC Del Rio Sector President and National Vice President, described Duran as his "right-hand man"; if Anfinsen could not complete certain tasks he sent them to Duran.

Duran worked Monday through Friday for eight regular hours and two of overtime, and was able to work from home. He usually began the workday at 6:00 a.m., though his hours varied, and there were days where he "report[ed] at 1:00 in the morning" and days where he did a full day of work "in uniform." Duran testified that agents did not have "a clock, where you go punch in and punch out." He was compensated hourly and usually

recorded his hours on a notepad and submitted his time before the end of the fourteen-day pay period.

Anfinsen testified that Duran did not have an official union supervisor. Neither Anfinsen nor any other union supervisor was officially charged with auditing Duran's time. But if a lead steward exhibited job performance issues, the union's executive board had authority to investigate.

### B. The Incident

Some days before the incident, a Kinney County Republican women's group contacted Anfinsen to offer the CBP agents pandemic supplies, including hand sanitizer, cookies, Gatorade, and peanuts. The donated supplies would be distributed across the several Del Rio Border Patrol stations.

The members asked Anfinsen to meet them and receive the supplies at the union hall on December 2. Anfinsen anticipated being on leave, so he asked Duran to "do [him] a favor" and meet them instead, since Duran lived minutes away from the union hall. Duran agreed to receive the supplies at 4:00 p.m., "after work."

On December 2, Duran began his day at home, "doing union work." He went into the station later that day to "work [his] obligatory overtime." He arrived at around 1:40 p.m. He testified to performing union work from about 6:00 a.m. to 2:00 p.m. and working his overtime from 2:00 to 4:00 p.m. His timesheet reflected a 6:00 a.m. to 3:30 p.m. workday. A time-stamped security camera video showed Duran pulling out of the parking lot at 3:58 p.m.

As Duran exited, he saw a group of people filming the CBP station. They were with Blaze News Media, and Barrier was among them. Duran

drove past the gate and "gassed it" on a right turn. As he did so, he heard people slapping his truck. Duran tried to avoid being filmed as he passed.

Around 4:00 p.m., Anfinsen received a call or message from a member of the women's group, asking for the agents. Anfinsen called Duran and remarked, "Hey, [the members] are there. Are you on your way[?]"As Anfinsen recalled, Duran responded he was on his way already, and Duran "didn't start driving that direction because [Anfinsen] called him." Duran testified that when he left the station on December 2, he was initially going home. But Anfinsen called at about 4:10 p.m. to ask, "Hey, dude, where are you at?" Duran responded, "Going home," and Anfinsen reminded him, "The ladies are waiting for you to deliver the donations. Did you forget?" Duran replied, "Yeah. I completely just forgot about it." He met the group members at the union hall after Anfinsen's reminder.

Barrier was standing "near the entrance of the station" when Duran struck her with his truck, and he continued driving without stopping. After Barrier was hit, a B

order Patrol supervisor standing outside heard "someone screaming that, 'Hey, he hit her. He hit her.'" The supervisor walked out to the gate, and someone exclaimed, "One of your guys hit this lady," and Barrier said, "He hit me with his truck." A video taken by the group did not show the collision, but captured the red pickup truck driving off and the screaming after. The incident was reported to the police at 4:10 p.m.

After Duran received the supplies at the union hall, he was called back to the station by the acting supervisor. He saw several CBP supervisors gathered. A police officer was also present and took a statement from him. One of the CBP supervisors remarked, "Hey, you're going to probably have to write a memo." Shortly afterward, the supervisors "talked to themselves" or "huddled," and they revised, "No, never mind. This is off duty." Duran

testified that he also did not think he needed to write a memo because he is "a union guy, [he knew] it wasn't related to Border Patrol," and it happened while he was "off duty."

Barrier sued the United States for damages under the FTCA. After discovery, the Government moved for summary judgment, arguing that Duran acted outside the course of his employment when he struck Barrier. The district court granted the Government's motion.

Barrier appeals.

## II. STANDARD OF REVIEW

We review grants of summary judgment de novo. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"[W]e consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence." *Turner*, 476 F.3d at 343. "Instead, we draw all reasonable inferences in favor of the nonmoving party." *Id.* (citation modified). "Summary judgment is improper if the evidence would permit a reasonable jury to return a verdict for the nonmoving party." *Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc.*, 334 F.3d 423, 427 (5th Cir. 2003).

## III. DISCUSSION

### A. The FTCA and Texas Law

"The FTCA was designed primarily to remove the sovereign immunity of the United States from suits in tort." *Millbrook v. United States*, 569 U.S. 50, 52 (2013) (citation modified). Under it, federal district courts have exclusive jurisdiction over claims against the United States for "'injury

or loss of property, or personal injury or death caused by the negligent or wrongful act or omission' of a federal employee 'acting within the scope of his office or employment.'" *Id.* (quoting 28 U.S.C. § 1346(b)(1)).

Whether an employee is acting within the course and scope of employment is governed by the state law where the act occurred. 28 U.S.C. § 1346(b)(1); *Bodin v. Vagshenian*, 462 F.3d 481, 484 (5th Cir. 2006). The parties agree that Texas law applies.

In Texas, an act "within the scope of the employee's general authority in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired" is within the course and scope of employment. *Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 131 (Tex. 2018) (citation omitted). Texas recognizes the "coming-and-going rule": an employer is not liable for the employee's acts when he is traveling to and from work. *Id.* at 136.

But a "special-mission exception to the coming-and-going rule may apply when travel involves the performance of regular or specifically assigned duties for the benefit of the employer." *Cameron Int'l Corp. v. Martinez*, 662 S.W.3d 373, 377 (Tex. 2022) (per curiam) (citation modified). A special mission is "a service in furtherance of [the] employer's business with the express or implied approval of [the] employer." *Painter*, 561 S.W.3d at 136.

It can involve "work or a work-related activity apart from the employee's regular job duties." *Rios Pina v. Sun Loans, Inc.*, No. 04-20-00336-CV, 2021 WL 3377600, at *2 (Tex. App.—San Antonio Aug. 4, 2021, pet. denied) (mem. op.) (citation modified). Courts "have recognized atypical assignments at the employer's direction . . . when acknowledging the existence of a special mission." *Id.* at *3. "Applying the special-mission exception 'depends heavily on the facts and circumstances of the case.'" *Cameron*, 662 S.W.3d at 378 (quoting *Painter*, 561 S.W.3d at 136).

### B. Analysis

Barrier argues that Duran's drive to receive the supplies was a special mission because the supplies "would assist Border Patrol in the performance of their official duties during the pandemic, when many regions experienced significant shortages of hand sanitizer and similar supplies." And the errand was "at the direction of the union president."

The Government counters that "an errand to get food, drinks or supplies, not at the direction of the employer, and even if shared with other employees, is not a 'special mission.'" The Government emphasizes that "this personal favor errand was not a CBP task, not with CBP's authority and simply just not a CBP special mission under Texas law."

Our analysis proceeds in two steps. First, we determine whether Duran may have been performing a special mission. Second, we discuss whether union-specific duties take an employee outside the course and scope of employment.

### 1. Special Mission

*Painter* is the first case we consider to help guide our special mission analysis. 561 S.W.3d at 136. There, an employee driller was paid a daily bonus to drive his crew in his personal truck between a mobile bunkhouse and their worksite. *Id.* at 128–30. The employee was driving the crew after their shift ended when he struck a vehicle. *Id.* at 129. An injured crewmember sued the employer to hold the employer vicariously liable. *Id.*

The court denied summary judgment. *Id.* at 135. Transporting the crew between the drilling site and the bunkhouse was one of the employee's job duties for which he was compensated. *Id.* The transportation benefited the employer by ensuring that the crew showed up to work, was not stranded onsite, and was "not hired away by other companies." *Id.* The employee was

"making his own services available," but also "ensuring the services of the rest of the crew." *Id.* at 137. So a fact issue remained regarding whether the employee acted within the course and scope of his employment. *Id.* at 139.

We recognize some similarities between this case and *Painter*. The *Painter* employee made his own and his team's services available to the employer. Similarly, Duran was receiving the donated supplies for other agents' use, since they were to be distributed to other CBP stations. And the *Painter* employee drove his personal vehicle while on the special mission, as did Duran.

Though the *Painter* employee was "off duty," he still received a bonus for transporting the crew. *Id.* at 140 (GREEN, J., dissenting) ("The accident happened after the crew's shift ended, when [the employee] and the crew members were off the clock."). But whether Duran was "off duty" is disputed. Duran first testified that, to the best of his knowledge, he worked his overtime hours from 2:00 to 4:00 p.m. and left around 4:00 p.m. Duran's timesheet indicates he "clocked off" at 3:30 p.m., but video shows him pulling out of the parking lot at 3:58 p.m. When asked at his deposition, Duran recalled the incident occurring around 4:04 or 4:10 p.m. And he testified that he "will help somebody whenever . . . regardless of whether I'm getting paid or not or off duty or on duty," as part of his job as a union officer. There is sufficient evidence to support a finding that Duran was still on duty when he left the station. This fact is genuinely disputed and material.

There is also a material fact question whether Duran was going home as he exited the station. Duran claimed he was. But as Anfinsen testified, Duran was already on his way to receive the supplies when Anfinsen called him sometime past 4:00 p.m. Viewing these facts in Barrier's favor, Duran was headed to the union hall to receive the supplies when he struck Barrier.

Taken together, the facts could lead a reasonable jury to find that Duran undertook a special mission.

*Arbelaez v. Just Brakes Corp.*, 149 S.W.3d 717 (Tex. App.—Austin 2004, no pet.) confirms that additional material fact questions remain. There, a car mechanic employee's "first assignment" was to pick up breakfast for himself and his co-workers. *Id.* at 718. Evidence indicated that the manager asked the employee to make the breakfast run. *Id.* While exiting the work parking lot in his own vehicle, the employee collided with the plaintiff, who sued to hold the employer vicariously liable. *Id.* The court denied summary judgment. *Id.* at 723.

The court reasoned that though the employer argued the breakfast run was for purely personal purposes, the employee testified it was his "first assignment." *Id.* And "[e]ven if [the employee] personally benefitted to some degree by his breakfast run, his actions could still be within the course and scope of his employment." *Id.* at 722. The employer argued that the run was not in furtherance of the business. *Id.* But a corporate representative testified that other locations also made regular breakfast runs—it benefited the employer because it "minimiz[ed] the number of absent employees." *Id.* at 719.

Again, there are both similarities and differences between *Arbelaez* and this case. The *Arbelaez* breakfast run was routine. And while receiving donated supplies was not necessarily "routine," Republican women's groups from Dallas, San Antonio, and San Angelo had previously sent supplies for distribution to the Del Rio CBP stations. Yet, unlike the run in *Arbelaez*, it is disputed whether Duran was asked to perform his task at the behest of a supervisor. Barrier argues that Anfinsen is Duran's "de facto" supervisor. Anfinsen testified that Duran was his "right-hand man," and Anfinsen sends Duran work. But both Anfinsen and Duran attest Duran does

not have an official union supervisor. Whether Anfinsen has some unofficial supervisory role over Duran and in that capacity asked him to receive the supplies is a jury question.

*Arbelaez* is not a special mission case. However, it demonstrates that even some acts not typically part of an employee's standard job description may be within the course and scope of employment if they further the employer's business. A jury could find that even receiving donated supplies—just like going on a breakfast run—is an act within course and scope of employment.

The Government resists *Arbelaez* because "dispatching on-duty CBP agents to go run errands to receive snacks at the union hall would result in fewer agents doing the actual work of a CBP agent and thus detract from CBP's law enforcement mission." But the vast majority of Duran's work encompasses duties outside of a CBP agent's traditional law enforcement work because he is a full-time union officer. And he often does his union work away from the station.

The disputed facts lead us to conclude that a reasonable jury could find that Duran's supplies receipt benefited CBP, and he was therefore on a special mission and within the course and scope of his employment. Summary judgment is inappropriate.

The Government's cases do not compel a different result. The Government first points to *Cameron*, where an employee who provided drilling site testing was asked to stay near the work site to wait for another job. 662 S.W.3d at 375. His supervisor invited him to dinner, and after attending, the employee drove to a grocery store and a gas station. *Id.* He was in a car accident after leaving the gas station, and the accident survivors and decedents' estates sued the employer, alleging vicarious liability. *Id.* at 376.

Neither the employer nor the supervisors directed the employee to travel to dinner or to purchase food, water, or fuel. *Id.* The employee testified that "he decided for himself" to travel "on his own time to have dinner and" buy groceries. *Id.* at 377. So the special mission exception did not apply. *Id.* at 376–77. In its reasoning, the court observed that though "[n]early every task that supports a worker's personal needs, including travel to and from work, indirectly benefits the employer[,]" not every task of this kind can be within the course and scope of employment. *Id.*

The Government also points to a recent opinion from our court, where a Marine Corps officer attended a recruiter training in San Antonio. *Conchas Mesraje v. United States*, No. 25-50414, 2026 WL 637284, at *1 (5th Cir. Mar. 6, 2026) (per curiam) (applying Texas law). After being dismissed for the day, he "was free to go and do whatever he wanted." *Id.* He drove to his hotel, changed his clothes, and left to pick up food. *Id.* He was in a car accident. *Id.* The injured plaintiffs sued the government under the FTCA. *Id.*

We held that the officer was not acting within the course and scope of his employment at the time of the accident. *Id.* at *3. Though he was authorized to be in San Antonio for a training and was driving a government vehicle, picking up food was not in furtherance of the Marine Corps' business. *Id.* The officer had completed his day's work, had not been instructed to drive to purchase food, and "was not recruiting during the time of the accident." *Id.* at *4. And even if the trip to San Antonio was a special mission, he was on a "personal deviation" at the time of the accident. *Id.* We granted summary judgment in favor of the government. *Id.* at *5.

This case is unlike *Cameron* or *Mesraje*. Those employees undertook entirely personal errands—buying food for their personal consumption. Here, Duran was headed to receive supplies that would be distributed to

other Del Rio CBP stations. There is no evidence that he was receiving the supplies for his personal use. As a result, these cases do not support summary judgment in favor of the Government.

### 2. Course and Scope of Union Employment

The Government next posits that Duran's CBP and union duties are "completely different and totally different things, that are even accounted for differently." So to be within course and scope of employment or on a special mission, Duran's act must have been for "the employer, which here CBP is not the union." The Government frames "the issue [as] whether, objectively analyzed, Agent Duran was performing tasks generally assigned of a CBP agent in the furtherance of CBP's mission." And CBP's mission is to "[p]rotect the American people, safeguard our borders, and enhance the nation's economic prosperity," not to receive snacks.

But the question is whether the act benefited the employer, and whether it was performed with the employer's express or implied approval. *Painter*, 561 S.W.3d at 136. Again, the supplies receipt could be found to have benefited CBP. And Duran was a CBP employee, even when he was performing union work.[1] His various union duties constituted 80% of his work

---

[1] After observing that there is little to no caselaw regarding union activity and vicarious liability, the district court concluded that "[w]hether on a mission or simply performing a favor for Anfinsen, Duran was not providing a representative [union] act for which he was entitled to official time." As the district court explained it by reference to a 1994 Federal Procedure Manual, representational acts are "authorized activities undertaken by employees on behalf of other employees pursuant to such employees' right to representation under statute . . . a collective bargaining agreement," or the like.

But when asked about it during oral argument, the Government conceded that an act does not fall in or out of the course and scope of employment depending on whether it is a representational activity. Instead, the Government argued that the course and scope analysis "rest[ed] on" the fact that CBP had no control over Duran's union activities. This

for CBP. It stands to reason that an act performed as part of his union duties had the implied approval of CBP.

The parties have not cited, nor have we found, Texas authority that treats union employment differently for a course and scope of employment analysis in a vicarious liability action. And we must apply Texas law as it is. *See Graham v. Milky Way Barge, Inc.*, 824 F.2d 376, 381 (5th Cir. 1987) ("As a federal court, it is not for us to adopt innovative theories of state law, but simply to apply that law as it currently exists." (citation modified)). Additionally, holding that Duran—a full-time union officer—was not in the course and scope of his employment when performing union work would place him out of scope for 80% of his workday. Surely, that cannot be.

Moreover, we see evidence that could lead a reasonable jury to find that the supply receipt was part of his regular union duties, without engaging in a "special mission" analysis. Duran's union work was varied and was not set by either union leadership or CBP. Anfinsen testified that he himself has "been asked for tax advice or divorce attorney recommendations," and "stewards are there basically to kind of help out wherever we can."

———————————————

is unfair, hypothesizes the Government, because if you "shift the risk of an activity" onto the employer under vicarious liability, the employer should be able to control that activity.

The Government focused on the wrong vicarious liability element. "[T]o prove an employer's vicarious liability for a worker's negligence, the plaintiff must show that, at the time of the negligent conduct, the worker (1) was an employee and (2) was acting in the course and scope of his employment." *Painter*, 561 S.W.3d at 131. The first element, whether the worker is an employee, is premised on the employer's "right to control the [worker's] actions." *Id.* The Texas Supreme Court has cautioned that courts must not conflate the right-to-control and course-and-scope elements. *Id.* When determining whether an employee is within the course and scope of employment, "[t]he employer's right to control the work, having already been determined in establishing the employer-employee relationship, is not part of this analysis." *Id.* at 132–33. And the Government acknowledged that Duran was a CBP employee, so the right-to-control element is not at issue.

When Anfinsen was asked whether Duran was "in the course and scope of work for the local union" at the time of the incident, he stated he believed Duran was doing him "a personal favor." Yet, he also said the act was "adjacent to union stuff," even though receiving supplies "is not something that [they] typically would consider sort of like a union duty." Ultimately, it was "related to union stuff," but not "spelled out as one of [their] responsibilities."

The Government also argues that "Anfinsen testified he could have called any of his friends or colleagues in Del Rio to help him out," but he called Duran because he lived nearby. What Anfinsen actually said was that he could have called on non-union agents for help, but he "suppose[d]" that he would not have called Duran to help if he did not work for CBP. In all, receiving supplies could be in the furtherance of the CBP's mission and for the accomplishment of the object for which Duran was hired as a union officer. *See Painter*, 561 S.W.3d at 132.

Lastly, the Government repeatedly argues that Duran was merely "performing a non-compensable personal favor." But "[c]onduct may be within the course and scope of employment even if done in part to serve the purposes of the employee or a third person." *Clanton v. Interstate Telecomm., Inc.*, No. 13-19-00107-CV, 2020 WL 1887759, at *6 (Tex. App.—Corpus Christi–Edinburg Apr. 16, 2020, no pet.) (mem. op.). Whether Duran was: (1) performing a personal favor, (2) completing a special mission, or (3) acting within the course and scope of his regular duties, it is for the jury to determine. Summary judgment was improper.

## IV. CONCLUSION

For the foregoing reasons, the district court's judgment is REVERSED, and this case is REMANDED for further proceedings consistent with this opinion.